Jerry Wayne SMITH, Petitioner,

v.

**Robert ATKINS, Director, Kansas State Penitentiary, et al., Respondents.**

No. 80–3125.

United States District Court,
D. Kansas.

June 2, 1983.

See also, 10th Cir., 678 F.2d 883.

Jerry Wayne Smith, pro se.

Joseph M. Fast, Asst. Atty. Gen., Topeka, Kan., for respondents.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

Petitioner, an inmate of the Kansas State Penitentiary, Lansing, Kansas, having been granted leave to proceed *in forma pauperis,* has filed with the clerk of the court this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction in the state of Kansas of three counts of kidnapping, one count of aggravated kidnapping, and one count of aggravated robbery. The direct appeal of his conviction to the Kansas Supreme Court

[*State v. Smith & Miller*] is published at 224 Kan. 662, 585 P.2d 1006 (1978); *modified* 225 Kan. 199, 585 P.2d 953 (1979); *cert. denied* 441 U.S. 964, 99 S.Ct. 2411, 60 L.Ed.2d 1069; *rehearing denied* 444 U.S. 889, 100 S.Ct. 191, 62 L.Ed.2d 124 (1979). The court has found that state remedies have been exhausted after reversal and remand by the United States Court of Appeals for the Tenth Circuit on the exhaustion issue.

Petitioner has moved the court to be provided with a copy of the voluminous state court records at government expense. The court denies this motion for the reason that the record discloses that transcripts were provided to petitioner by the State prior to his direct appeal and that he has repeatedly formulated and presented the issues raised herein to various tribunals. No particularized need for another copy of the record is shown. Furthermore, a line-by-line review of the record has been undertaken by this court in its determination of this petition.

The Tenth Circuit found, and this court concurs, that the claims raised by this petition are:

1–3. that a warrant issued for the search of petitioner's automobile was obtained under circumstances which violated Fourth Amendment principles, including those enunciated in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978);

4. that double jeopardy principles precluded the state prosecution in light of a prior federal prosecution for acts arising out of the same transaction;

5. that petitioner was denied a speedy trial;

6. that the evidence was insufficient to support the verdict;

7. that a transcript of the suppression hearing held in the federal action was improperly admitted in the state action;

8. that the trial court improperly denied petitioner's request for severance;

9. that the trial court improperly refused to give petitioner's tendered instruction defining the crime of aggravated kidnapping;

10. that petitioner was denied a fair trial due to adverse pretrial publicity; and

11. that the trial court erred in denying petitioner's request for a mistrial based on alleged improper prosecutorial comment.

The court shall consider each of these claims in turn.

## FACTS

The facts underlying the petition are found to be as follows. A robbery occurred at a branch bank of the Fourth National Bank and Trust Company in Wichita, Kansas, on the 6th day of January, 1975, which was reported to the police dispatcher at approximately 7:00 a.m. The persons who committed the offense were described to police by the victims as being two black males. Physical and clothing descriptions were obtained and were broadcast by the Wichita Police Department dispatcher. Soon thereafter additional descriptions were broadcast supplementing the original information. In the first report by the victims, a wide-brimmed, black hat was mentioned as having been worn by one of the robbers.

Sometime between 7:18 a.m., when a description of one of the suspects was broadcast by the Kansas Highway Patrol, and 7:33 a.m., Trooper David McGlasson of the Kansas Highway Patrol, who was assigned to the turnpike, stopped to assist a parked Cadillac automobile which had a flat tire. He requested identification from the two persons attending the vehicle, who gave identification indicating that they were Jerry Wayne Smith and Carroll James Miller. The trooper testified that prior to approaching the vehicle he had received a report that a pick-up truck which had been reported as the possible get-away vehicle had been found abandoned. In the course of his conversation with the two men, the trooper asked where they had entered the Kansas Turnpike. They told him they had entered in Kansas City. The trooper also testified

that he asked them if they had been in Wichita the night before, and they said, "no, we came from Kansas City." After leaving the parked vehicle, he realized that the back glass was covered with frost and formed an opinion that had the vehicle entered in Kansas City the back glass would be clear. Thus, he became suspicious that the occupants had not been truthful with him, so at 7:33 a.m. he requested the toll booth operator at the next exit to advise him as to where the vehicle had entered the turnpike. At 7:47 a.m., Trooper McGlasson was advised that the vehicle had passed through the toll booth and that it indeed had entered at the South Wichita Interchange of the Kansas Turnpike. Trooper McGlasson then had a conversation with the Wichita Police Department dispatcher. Information with respect to Trooper McGlasson's encounter with the two men on the turnpike and the information from the toll booth operator were put together with the information from the scene of the robbery and additional dispatches were made. At this point, the trail of the dispatch becomes impossible to precisely trace. During the stop, Trooper McGlasson did observe, among other similarities, a black hat which fit the general description of the hat seen by the victims.

Roger Sixkiller of the Oklahoma Highway Patrol and Gary Sinclair of the Kay County Oklahoma Sheriff's Office learned by means of regular communications channels of the description of the automobile sought in connection with the robbery after the encounter by Trooper McGlasson and other details concerning the occupants of the vehicle, as well as details relating to the description of the robbers obtained from the victims at the scene, including a description of a black hat. They stopped the vehicle in the state of Oklahoma, spotted the black hat on the front seat and noted similarities between the occupants and descriptions of the suspects. The occupants were taken to the city jail in Tonkawa, Oklahoma, and there were held in custody. Officer Sinclair proceeded to further investigate the matter by having a telephone conversation with Sergeant Williams of the Wichita Police Department, who, along with other officers, was investigating the robbery. In that conversation, Officer Sinclair learned further details concerning the descriptions given by the robbery victims and employees of the Fourth National Bank in Wichita. While the descriptions were incomplete and did not describe all the clothing worn by the robbers, those descriptions given of clothing and the general physical characteristics of the robbers were consistent with that of the persons who had been taken into custody in Oklahoma. Officer Sinclair then traveled to the county seat to attempt to obtain a warrant to search the vehicle. In support of the application for warrant of search and seizure, Officer Sinclair made the following affidavit:

"I, Gary Sinclair, of lawful age and after being first duly sworn upon oath, depose and state that the following property constitutes evidence of the commission of a crime, to-wit: Undetermined amount of money and 38 Smith & Wesson Revolver. And that the above mentioned property is now located in Kay County, State of Oklahoma, at the specific locality within said County and State as follows, to-wit: A 1969 Cadillac brownish gold in color with a black vinil (sic) top, bearing 1973 Oklahoma license No. YJ8016 and 1974 Tab No. 203977. All of which is known to your affiant and based upon the following facts, to-wit: That at approximately 7:50 a.m. on January 6, 1975 the Affiant received a radio dispatch that an armed robbery had occured (sic) in Wichita, Kansas. The dispatch included a description of the vehicle as follows: 1968 to 1970 Cadillac, black over tan bearing 1973 Oklahoma license no. YJ8016, being occupied by 2 male negros (sic). That the dispatcher also indicated that these persons were involved in a commission of a crime of robbery with firearms in Wichita, Kansas at about 7:00 A.M. on January 6, 1975. The dispatcher also reported that the car was last seen at the turnpike gate traveling South on I-35.

"Affiant then proceeded to I-35 and set up a road block in the South bound lane

on I–35. A vehicle matching the description received from the dispatcher was stopped approximately 3/4 miles (sic) North of U.S. 60 heading South on I–35. The vehicle had the same license tag no. YJ8016 and was occupied by 2 negro males. The subjects were placed under arrest by the Affiant.

"Prior to stopping the subjects it was reported to the Affiant by the dispatch there was an undermined (sic) amount of cash was (sic) taken and that a firearm had been used in the robbery in Wichita, Kansas.

"Further the Affiant Sayeth Not."

Officer Sinclair also gave to the judge who issued the search warrant testimony which was not recorded regarding descriptions of the persons they had taken into custody and their clothing, as well as his viewing of a black, wide-brimmed hat on the front seat of the vehicle.

## FOURTH AMENDMENT CLAIMS

Petitioner asserts that his right under the Fourth Amendment to be secure against an unreasonable search and seizure has been violated in that there was not sufficient probable cause for his initial arrest and the affidavit upon which a search warrant was obtained was insufficient on its face and contained material misstatements of fact. He further asserts that as a consequence there was no valid warrant or probable cause for the search of his automobile. On this basis, he contends that he was entitled to have suppressed at trial all evidence seized in the search. Petitioner was convicted in state court, at least in part, on the basis of evidence seized pursuant to the search warrant. He challenged the validity of the arrest and search warrant on a pretrial motion to suppress, which was denied after an evidentiary hearing conducted by a district judge. The denial was upheld by the trial judge and on direct appeal.

■ The threshold issue presented by petitioner's allegations is whether or not he was afforded an opportunity for full and fair litigation of his Fourth Amendment claims in state courts, because, if he was, then federal habeas corpus review is not available. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, *rehearing denied* 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976); *Gamble v. State of Oklahoma,* 583 F.2d 1161 (10th Cir.1978). *See also Gomez v. Bray,* No. 81–2430 (10th Cir., *unpublished,* 4/29/82). Petitioner now alleges that he was denied such an opportunity in that the state of Kansas at the time of his trial applied a rule of law known as the "no attack" rule, which prohibited challenges to the veracity of statements contained in a facially-sufficient affidavit for a search warrant. Petitioner further alleges that his conviction was affirmed by the Kansas Supreme Court without their addressing his claim that the warrant was procured by "material police perjury." He avers that he moved for a rehearing on the ground that the court had neglected to rule upon his false affidavit claim citing the recent decision of *Franks v. Delaware, supra,* but that the "request was denied." Based on the foregoing allegations, petitioner asserts that he did not receive a full and fair hearing in the state courts and that the material facts were not resolved on the merits.

Petitioner's main substantive contention in this petition is that the search warrant was invalid because it was procured by police perjury and fraud. In support of this contention, he alleges that the Kay County Sheriff's Officer, Gary E. Sinclair, who assisted at the arrest and subsequently went before a magistrate to obtain a search warrant, "intentionally manufactured and obtained a warrant ... by supplying the District Court ... in Kay County, Oklahoma, with material false perjury in the underlying affidavit ... by intentionally setting forth facts and circumstances which came into his possession after the arrest...." More specifically, petitioner alleges that Officer Sinclair did not have, at the time of the arrest, the information attested to in the affidavit, but acquired it during a telephone conversation with Sergeant Williams of the Wichita Police Department after petitioner was arrested and jailed.

A review of the pretrial suppression motions filed by and on behalf of petitioner, the lengthy transcript of the suppression hearing, the appellate briefs, as well as the opinions and findings of the state judges, together with petitioner's motion for rehearing, disclose that if the facts were not fully developed on any of petitioner's Fourth Amendment claims, it was certainly not due to any lack of procedural opportunity. Petitioner represented himself with the assistance of appointed counsel throughout the state criminal proceedings and was permitted to file a brief and supplemental brief on appeal. The claims he raises herein, and in particular his claim that false information was contained in the search warrant affidavit, were presented in his briefs and arguments to the state courts. No state judge or court refused on the record to hear his claims on the basis of the "no attack" rule. There was precedent in Kansas for this rule at the time of petitioner's trial, but the Kansas court clearly did not apply it in this case. *See e.g., State v. Wheeler*, 215 Kan. 94, 523 P.2d 722 (1974); *State v. Lamb*, 209 Kan. 453, 497 P.2d 275 (1972). The State did briefly argue on this authority that matters may not be disputed in the supporting affidavit to a warrant which is valid on its face. However, petitioner was allowed to present any witnesses, arguments, testimony or other evidence to prove his allegation that Officer Sinclair made false statements in the affidavit. And he attempted to present such evidence by seeking records of radio communications, questioning dispatchers who had transmitted messages concerning the robbery, and examination under oath of Officer Sinclair. Nevertheless, despite his present assertions to the contrary, petitioner did not prove at the state suppression hearing that affiant Sinclair did not have the information as claimed in his affidavit prior to the arrest. Smith stated his argument as follows:

"Sinclair testified that he stated in the search warrant that prior to stopping this subject it was reported to the applicant by the dispatcher that an undetermined amount of cash had been taken and that a firearm was used.... He testified this morning that he received this information sometime after the arrest...." IV Record, p. 187.

The main premises of petitioner's argument are that the affiant Sinclair had testified that he had received only two transmissions, one from the Kay County Sheriff's Office and the other from Ark City, but that dispatchers at these locations on duty the morning of the robbery had stated that no broadcasts of the crime were logged so that Officer Sinclair could not possibly have received the information as claimed prior to the arrest. One colloquy in particular between petitioner and Judge Klein, who presided at the state suppression hearing, demonstrates that petitioner was allowed to present and attempt to prove his arguments and that Judge Klein was simply not convinced by this argument. The judge made the following inquiry after petitioner's suggestion that Officer Sinclair had not received any broadcasts prior to the arrest:

"The Court: Are you suggesting that the witness (Sinclair) in some fashion received some cosmic knowledge of this offense that he acted upon....?

"Defendant Smith: The witness didn't get the information at all, that's what we are suggesting and that's what we intend to prove.

"The Court: ... If you want to make argument about that ... you may do so.

"Defendant Smith: ... Now he said he had two sources, he said Kay County and he said Ark City, and if they don't have it on log, your Honor, and it's the law, well then he didn't get it, it's just that clear.

"The Court: I don't believe the evidence you have in the record will bear the weight which you have just now placed on it.

\* \* \* \* \* \*

"The Court (to defendant's co-counsel): ... the fact that there is no log does not bear any inference that a transmission was not made, such as your client and co-counsel seem to want to be absolutely the conclusion from an absence of log...." V Record, pp. 61–64.

As pointed out by Judge Klein, the record does not support petitioner's account of the testimony. Officer Sinclair had testified earlier that he had received one transmission from Ark City and another from Kay County. However, contrary to petitioner's memory, Officer Sinclair consistently testified that he had received more than these two transmissions:

"Q. Did you receive transmissions from other than Ark City and Kay County?

"A. Yes, sir, I was receiving through-out—transmissions throughout.

\*      \*      \*      \*      \*      \*

"Q. But you previously testified under oath that Ark City and Kay County Sheriff's Office were the sources of your information?

"A. Yes, sir. I didn't relate that that was total." V Record, pp. 32–34.

When questioned about the capacity of his police radio, Sinclair testified that he could monitor broadcasts from the Oklahoma Highway Patrol, Kansas Highway Patrol, local police departments and fire departments, as well as the Sheriff's Office. And, finally, after being told that the two dispatchers reported that they had not logged outgoing broadcasts of the robbery, he stated that it was still his testimony that he had received transmissions regarding the robbery from Kay County and Ark City as well as Pawnee and the Oklahoma Highway Patrol. These portions of the record establish that the state court evaluated the validity of the affidavit and search warrant in light of the testimony and evidence presented and did not invoke the rule that a criminal defendant cannot attack an affidavit which is facially sufficient.

Furthermore, the record fully supports Judge Klein's refusal to find that Officer Sinclair made false statements in the affidavit. No convincing proof was made of any intentional or deliberate misrepresenta-tion in the affidavit as to any material matters relevant to the showing of probable cause for the search. *Cf., Franks v. Delaware, supra,* 438 U.S. at 171, 98 S.Ct. at 2684. The factual inaccuracies stressed by petitioner not only were not proven, but also fall short of destroying the integrity of the affidavit.[1]

It is clear from the foregoing discussion that petitioner attacks the state court's denial of the suppression of evidence, not because of any lack of opportunity to litigate his claim of police perjury, but because of his disagreement with the routine credibility determination made by the state judge after a contested suppression hearing. Under *Stone v. Powell, supra,* this court may not revive a Fourth Amendment issue by substituting its evaluation of the facts for that of the judge who heard the evidence. *United States ex rel. Petillo v. State of New Jersey,* 562 F.2d 903 (3rd Cir.1977). *Stone v. Powell* precludes federal court review of a state court finding of probable cause so as to admit or exclude evidence unless circumstances indicate that the state proceedings were unreliable. *Id.; Nolan v. Griffin,* No. 80–1505 (10th Cir., *unpublished,* 8/26/81); *Graves v. Estelle,* 556 F.2d 743 (5th Cir.1977). Petitioner has utterly failed to allege facts supported in the record which would indicate that he was denied an opportunity for a full and fair litigation of his Fourth Amendment claim and has described no circumstances which would suggest that the state proceedings were unreliable. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *together with Gamble v. State of Oklahoma, supra,* at 1164. Petitioner has not demonstrated that the state hearing and appellate processes were deficient. Nor does the record disclose any such inadequacy. There is absolutely no indication in the record that petitioner was not allowed to produce all of the evidence he desired. The fact that a

---

1. Even if the alleged misstatements in the affidavit were disregarded (*i.e.,* if Officer Sinclair were held to have received the information that an armed robbery had been committed after the arrest by Trooper Sixkiller instead of be-fore) this court does not perceive how the remaining allegations in the affidavit are materially altered for the purpose of finding probable cause to issue the search warrant.

defendant later decides he had more evidence to present does not mean he was not given a full and fair opportunity to litigate his claim. *Pulver v. Cuningham,* 562 F.2d 198, 200 (2nd Cir.1977); *Sanders v. Oliver,* No. 78–3004 (D.Kan., *unpublished, 5/02/78*), *aff'd.* 611 F.2d 804 (10th Cir.1979), *cert. denied* 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980). The court concludes that petitioner was afforded a full and fair opportunity to litigate his claim of police perjury in the warrant affidavit and is not entitled to federal habeas corpus relief.

■ Other Fourth Amendment challenges to the search made by petitioner are that Officer Sinclair's affidavit made in support of the search warrant was based upon the tip of an anonymous informant whose reliability was not established and that there was not sufficient, independent probable cause for the search of the trunk of the automobile in that the arresting officers had no reason to believe that contraband would be found there. Petitioner also contends that his arrest was illegal. In support of the latter claim, he alleges that there was not sufficient probable cause under Oklahoma, Kansas or federal law for his arrest by Trooper Sixkiller because the trooper had not received information that an arrest warrant had been issued for petitioner, had not been ordered to arrest petitioner, and neither he nor the two other officers assisting in the arrest had independent, personal knowledge of the commission of a crime, petitioner's participation therein or other incriminating circumstances. Instead, petitioner alleges, the only information had by the arresting officers in Oklahoma about the commission of this crime and the persons who may have committed it was unsupported and uncorroborated tips from unknown informants of unproven reliability, or double hearsay.

It has been difficult to scrutinize and to organize a discussion of petitioner's Fourth Amendment claims because they are confused and the content and focus have varied from proceeding to proceeding. For example, petitioner first alleged that Trooper McGlasson supplied false information, then later it was Officer Sinclair. At first, he emphasized his claim that the affiant had no personal knowledge of the crimes and the warrant was invalid because material information was supplied by an unidentified informant. Later, petitioner stressed his contention, previously discussed, that Officer Sinclair fraudulently obtained the search warrant. For this reason, these other claims are discussed together rather than individually.

With regard to petitioner's Fourth Amendment claims, Judge Klein made specific findings of fact and conclusions of law. The statement of facts earlier set forth in this opinion is a paraphrase of Judge Klein's factual findings. This court has found these findings to be supported by the state court trial transcript and records. Additional specific findings made by Judge Klein include the following:

"The Court finds that from—from facts known to all, the police—Wichita Police Department, Officer McGlassen (sic), Officer Sinclair and Sixkiller, combined, reasonable grounds existed at or about—between 8:18 and 8:30 on the 6th day of January, 1975, or believed that the defendants had committed the offense of bank robbery in Wichita, Kansas, earlier that day and probable cause then existed for arresting them.

\* \* \* \* \* \*

"I am clearly finding that—that not all of the information bearing on probable cause was in the hands of Officer Sixkiller and—and Sinclair, but that the total information in the hands of the police was sufficient to find probable cause and reasonable grounds to believe the defendants had committed the offense.

\* \* \* \* \* \*

"The Court concludes that then, as a matter of law, that the transmissions over police radios, reporting the results of investigations at crime scenes are not the same as anonymous tips, under the law, and that all officers are entitled to rely on them as being within reason, faithful, and accurate, factual reporting and enti-

tled to rely on them in the conduct of the police function, including the stopping of suspects and arresting them. They do not require independent and separate authentication of the source of the facts, and the officer is entitled to compare the reports with the persons at hand to form the reasonable grounds and probable cause conclusions and to act thereon. Furthermore, that the acts of the police, under circumstances of this nature, need not be based on personal information; that is, that the total information in the hands of the police may be used to—to justify an arrest.

\*     \*     \*     \*     \*     \*

"I also conclude that the affidavit in support of the application for search warrant is sufficient without further comment on that subject. I ... conclude as a matter of law, however, that the search is—was lawful as a search incident to a lawful arrest, and that the—the delay in the search, while details known to police but not yet known to the officer on the scene were made known to him is not unreasonable delay ... and the time involved does not remove the search from the concept of search incident to a lawful arrest, regardless and in spite of and absent the search warrant, justified on the basis of a search incident to a lawful arrest under exigent circumstances, namely, the motor vehicle. Therefore, the motion to quash the evidence seized ... from the vehicle ... will be overruled.

\*     \*     \*     \*     \*     \*

"I should, I think, find that the search warrant under Oklahoma law, may not be justified by subsequent testimony not recorded—testimony given at the same time, but not recorded; and I find that most probably that testimony which Officer Sinclair says he gave under oath and which I believe was not recorded, as required by law; and, therefore, is unavailable to justify the search—the issuance of the search warrant. I do find that that information, together with what is in the affidavit is clearly sufficient to justify the issuance of the search warrant, regardless of the status—without that evidence, which I have already concluded is by itself sufficient." IV Record, pp. 246–262.

It is obvious from the record in this case that petitioner is not entitled to federal habeas corpus relief on any of his Fourth Amendment claims for the reason that these claims were thoroughly litigated in his pretrial motion to suppress. The trial judge also found the warrant to be sufficient. A motion for new trial was filed citing the failure to suppress as error. The claim of error was rejected and the motion for new trial was denied. The claims were presented in petitioner's briefs to the Kansas Supreme Court and they were rejected. Rehearing was denied by the appellate court. Petitioner then presented his claim to the United States Supreme Court, and *certiorari* was denied. Rehearing was also denied. The burden is on petitioner to establish that he was denied an opportunity for a full and fair litigation of his Fourth Amendment claims [*Nolan v. Griffin, supra; Caver v. State of Alabama,* 537 F.2d 1333 (5th Cir.1976), *cert. denied* 430 U.S. 910, 97 S.Ct. 1183, 51 L.Ed.2d 587 (1977)]; he has utterly failed to show the lack of such an opportunity.

Furthermore, the court finds that the state courts did not willfully refuse to apply correct Fourth Amendment constitutional standards. *See Gamble v. State of Oklahoma, supra.* The cases relied upon by petitioner in support of his claims are not directly on point with the facts of this case. The cases relevant to these issues are set forth in *United States v. Miller,* 532 F.2d 1335 (10th Cir.1976), *cert. denied* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 106 (1976). This court agrees with the state court that petitioner's characterization of Trooper McGlasson and other law enforcement personnel as unknown informants whose reliability had not been tested is ill-conceived. The descriptions of the robbery suspects which were eventually communicated by police radio and telephone to Trooper McGlasson and the arresting officers origi-

nated with the victims and eyewitnesses of the criminal events rather than an unknown informant.

■ Petitioner's claim of a lack of probable cause is more properly analyzed and is clearly without merit under the "exigent circumstances" or "automobile" (readily moveable object) exception to the exclusionary rule as was held in *United States v. Miller, supra;* or, perhaps even the "inventory search" exception. *See, e.g., United States v. Miller, supra; Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *see also Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). The court also finds no error in the state court's holdings that the collective knowledge of the law enforcement officials involved constituted sufficient probable cause to arrest, that the search warrant affidavit was sufficient on its face to permit a neutral judge to reasonably conclude the probable cause for a search existed,[2] and that even if the warrant was tainted the search was valid as incident to a lawful arrest. The state court's definition of probable cause for an arrest, although based on Kansas law, was in substantial accord with the United States Supreme Court's definition in *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), which stated:

"... Whether that arrest was constitutionally valid depends in turn on whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was com-

mitting an offense...." (Citations omitted.) *Id.* at 91, 85 S.Ct. at 225.

This court concludes that the Kansas courts unquestionably provided petitioner with full and fair consideration of his Fourth Amendment claims. *Sanders v. Oliver, supra.* The court further finds that the Kansas Supreme Court was presented with petitioner's challenges to the arrest, search warrant and seizure on the merits. The fact that the court did not specifically address the false affidavit claim in their written opinion is not evidence that it was not fully and fairly considered. *Moore v. Cowan,* 560 F.2d 1298 (6th Cir.1977), *cert. denied* 435 U.S. 929, 98 S.Ct. 1500, 55 L.Ed.2d 525 (1978); *Dunn v. Rose,* 504 F.Supp. 1333 (M.D.Tenn.1981). Under these circumstances, the constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial. *Stone v. Powell, supra; Chavez v. Rodriguez,* 540 F.2d 500 (10th Cir.1976); *Redford v. Smith,* 543 F.2d 726 (10th Cir. 1976); *Sandoval v. Aaron,* 562 F.2d 13 (10th Cir.1977); *McDaniel v. State of Oklahoma,* 582 F.2d 1242 (10th Cir.1978), *cert. denied* 439 U.S. 969, 99 S.Ct. 462, 58 L.Ed.2d 429.

This court's determination that it may not review petitioner's Fourth Amendment claims is consistent with the rationale of *Stone v. Powell, supra.* There, the court held that the educative and deterrent effects of the exclusionary rule were minimal in the federal habeas corpus context and were certainly outweighed by the societal costs of extending it to collateral review of Fourth Amendment claims. Concerning those societal costs, the court stated:

"The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the

**2.** These two findings are the same as were made on the same facts by the United States Court of Appeals for the Tenth Circuit in *United States v. Miller, supra,* which is the direct appeal of petitioner's and his co-defendant's convictions in federal court for federal bank robbery arising out of the same incident.

central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. . . .

\* \* \* \* \* \*

"Application of the rule thus deflects the truthfinding process and often frees the guilty. . . ." *Id.*, 428 U.S. at 489–90, 96 S.Ct. at 3050.

This decision prevents an undoubtedly guilty person from escaping punishment on a "technicality" in a situation where it is obvious that the purposes of the exclusionary rule would not be well served, and evinces this court's conviction that the state courts are as capable as the federal courts of preserving Fourth Amendment rights.

## DOUBLE JEOPARDY

Petitioner contends that the state offenses of which he was convicted were lesser-included offenses of the federal bank robbery offense, and that the elements of force and violence which were previously litigated during the federal prosecution were unlawfully relitigated in the state proceedings. On the basis of these contentions, petitioner asserts that the state prosecution violated double jeopardy principles.

The right under the Fifth Amendment not to be twice put in jeopardy of life and limb for the same offense is a fundamental right applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Violation of the double jeopardy clause is a question of law. *Baker v. Metcalfe*, 633 F.2d 1198 (5th Cir.1981), *cert. denied* 451 U.S. 974, 101 S.Ct. 2055, 68 L.Ed.2d 354. It follows that no evidentiary hearing is required to determine this claim.

■ The court finds that petitioner's double jeopardy claim has no merit. It is well settled that federal double jeopardy principles are not implicated by successive prosecutions by the state and federal government even for identical offenses involving identical issues. *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Goode v. McCune*, 543 F.2d 751 (10th Cir.1976); *United States v. Smaldone*, 485 F.2d 1333 (10th Cir.1973), *cert. denied* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286; *United States v. Villano*, 529 F.2d 1046 (10th Cir.1976), *cert. denied* 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193; *see also, United States v. Brubaker*, 663 F.2d 764 (7th Cir.1981); *United States v. Iaquinta*, 674 F.2d 260 (4th Cir.1982).

■ Nor does the law of the state of Kansas lend merit to petitioner's double jeopardy claim. Under the state's own interpretation of its double jeopardy statute (K.S.A. 21–3108), which this court is bound to follow, the federal prosecution is not a bar to the subsequent state prosecution for the reason that the offenses charged by the two sovereigns are not "identical." *See Goodseal v. Atkins*, No. 79–3213 (D.Kan., unpublished, 3/11/83). Even though some of the same statutory and factual elements might have been considered in the two proceedings, the state and federal offenses each required proof of statutory and factual elements which the other did not. For this reason, the classic "Blockburger" test for separate offenses is satisfied. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

## SPEEDY TRIAL

■ Petitioner alleges that his right to a speedy trial was violated. Facts pertaining to this claim appear in the petition, the state court records and exhibits, and were further developed in a hearing on petitioner's pretrial motion to dismiss for denial of speedy trial.

As has been noted, petitioner and his co-defendant were arrested in Oklahoma on January 6, 1975. Petitioner was arraigned on the federal charge on January 7 and confined in the Sedgwick County Jail in federal custody. A complaint charging petitioner with the state offenses was file-stamped in the court of common pleas on January 10, 1975. On January 20, petition-

er asked his federal public defender, Robert Fuqua, whether or not state charges were pending. Fuqua testified that he talked to a deputy clerk of the court of common pleas and reported to his client that no state charges had been filed.

Due to crowded jail conditions, petitioner was moved to the Harvey County Jail in Newton, Kansas, on January 22. The jury trial on the federal charge began on February 5 and concluded on February 10. Petitioner was sentenced on April 7 and was transferred to the Federal Correctional Institution in El Reno, Oklahoma, on April 17, 1975. Petitioner alleges that he was not released on appeal bond following the federal sentence because of a state detainer.

Federal Public Defender Fuqua testified that petitioner wrote him on May 14, 1975, and told him that state charges were pending. Petitioner testified that a detainer, or request for temporary custody for trial on the Kansas charges, was lodged against him at El Reno in May, 1975. The detainer was stamped received May 21. The warden notified petitioner of the detainer the first week in June. Petitioner wrote the clerk of the court of common pleas in late June or early July requesting information and documents concerning the charges. The clerk responded that his inquiry should be directed to the Assistant District Attorney, Thomas Sherwood. Petitioner testified that he then wrote to the district attorney asking for a copy of the charges and received no response; however, there was no such letter in the district attorney's file and petitioner did not produce a copy. Petitioner wrote Fuqua for advice and thereupon filed a motion for speedy trial. On cross-examination, petitioner stated that he filed a motion for a speedy trial in July, but that he never filed a formal request under the "Uniform Detainers Act."

On Friday, August 8, 1975, petitioner first received a copy of the complaint and was served with the arrest warrant[3] in the state case when he was picked up from El Reno and taken to the Sedgwick County Jail. Petitioner was arraigned on Monday, August 11. Trial was originally set for September 22 and was continued several times until November 17, 1975, when the matter actually proceeded to trial. The continuances were mainly due to the scheduling of pretrial motions filed by defendants.

The chief dispatcher of the Kansas Turnpike Association testified that all recordings on the tape of January 6, 1975, which included those pertaining to the Fourth National Bank robbery, were erased approximately two months after that date. Another official testified that the erasure was in accordance with the agency's routine, economic procedure of recording over used tapes absent a request for retention. The chief dispatcher stated that he had transcribed all radio transmissions on the association's frequencies on the date of the robbery, which amounted to ninety-three transmissions, that he ran the tape in federal court, and that he was not asked by any law enforcement agency or attorney to retain the original tape. The other dispatcher testified that the federal defender attorneys for defendants had reviewed the entire tape. These facts are not materially disputed. Consequently, the question of whether petitioner's speedy trial right was violated is a question of law and does not require an evidentiary hearing. See United States v. Hutchins, 489 F.Supp. 710 (N.D.Ind.1980).

Petitioner alleges that he was prejudiced by the delay in bringing him to trial in that evidence of police radio reports was not preserved; the memory of witnesses faded so that he was "unable to call" Kenneth Esterly, Randall Beaver and Herbert Barker, who had information pertaining to police reports of descriptions; his educational program was interrupted at El Reno; he was denied release on appeal bond; he was denied his right to trial within one hundred eighty (180) days under the Kansas speedy trial act; and he suffered anxiety.

---

3. The Marshal's Return on the warrant shows that it was received on January 10, 1975, and executed on August 8, 1975.

734

The state court found, on petitioner's pretrial motion, that the marshal of the court of common pleas issued the warrant of arrest to the authorities where petitioner was incarcerated on or about May 12, 1975; that shortly thereafter petitioner learned of the charges; that on May 20 the State requested temporary custody of petitioner; that petitioner was released to state officials on August 8; and that there was no unusual delay after that date. That court further found with respect to the missing tapes that the Wichita Police Department tape existed until August 29 or 30, well after petitioner knew of the impending trial, and that the Kansas Highway Patrol tape was routinely erased in a short time, but that no prejudice resulted. That court stated:

"... the defendants were accused in Federal Court of crimes growing out of the same events that these charges grow out of, and at a time when they were before a court which had the power to compel the maintenance and preservation of all of that evidence and at a time when they were represented by competent counsel.... Whether or not the contents of those tapes would have had anything to do with this trial is a matter of great conjecture. The material parts of that are ordinarily made a part of officer's reports, and it's not shown that—that those are not available and are not to be furnished under the usual discovery rules ...." VI Record, pp. 2–3.

The court concluded that no unreasonable delay was shown and that the delay of the State in not requesting temporary custody until after the federal proceedings were concluded was "simply a practical matter to avoid interference with dockets of each court...."

Petitioner asserts that the ten-month delay between the filing of the complaint and the date of trial was unreasonable and in deprivation of his rights under the Sixth Amendment of the United States Constitution.

In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court identified four factors to be considered in determining whether an accused has been deprived of his right to a speedy trial: (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. *United States v. Ramirez,* 524 F.2d 283 (10th Cir.1975); *Gooley v. Ricketts,* No. 80–2116 (10th Cir., unpublished, 1/14/82). No one factor alone is necessary or sufficient to establish a violation of the speedy trial guarantee; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker v. Wingo, supra,* 407 U.S. at 533, 92 S.Ct. at 2193.

The first factor, the length of the delay, is to some extent a triggering device. *United States v. Jenkins,* 701 F.2d 850 (10th Cir.1983). The ten-month delay in this case might be considered intolerable if there were no justifiable reason for any delay. Consequently, an inquiry into the other factors is triggered. The court, therefore, has considered the circumstances and reasons for the delay.

During the first three months of the ten-month delay in this case, petitioner was involved in federal criminal proceedings, and the final nearly two months are attributable to defense pretrial motions. The postponement of the state trial during this time was not unreasonable. The court also does not believe that the delay of six weeks from the conclusion of federal proceedings to the state's request for temporary custody can be termed unreasonable, particularly in light of the fact that it was at least a month after Kansas requested temporary custody for trial before Smith made his request for a speedy trial. Nor is the court able to find that the four months from petitioner's federal sentencing to the time he was taken into state custody was unreasonable since his removal had to be authorized, arranged and effectuated from the custody of one jurisdiction to another. Further, there is no showing whatsoever that the state of Kansas purposefully caused this delay to gain some advantage or that it was unnecessary. *See United States v. Ramirez, supra; cf., United States v. Marion,*

404 U.S. 307, 325, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). Petitioner arrived at the Sedgwick County Jail at 4:00 in the afternoon on the Friday he was taken into Kansas custody and was arraigned the following Monday morning. From these observations, the court finds the state court's conclusion, that the delay was not unreasonable between the filing of the complaint and petitioner's trial in state court, to be fully supported by the undisputed facts. It follows that the reason for the delay is not a factor that balances in petitioner's favor.

The demand factor does not weigh to the advantage or disadvantage of either party for the reason that petitioner did not make an immediate demand, but was led to believe that state charges had not been filed.

This court also agrees with the state court's assessment of the prejudice factor. While the bare claim that tapes were destroyed which petitioner might have introduced into evidence may suggest prejudice, petitioner has utterly failed to actually demonstrate prejudice. Common interests of an accused affected by a delayed trial are the prevention of oppressive pretrial incarceration and the minimization of the anxiety and concern accompanying public accusation. These interests are less significantly affected in this particular case where petitioner was incarcerated in a federal penitentiary throughout the delay after conviction of a serious federal crime arising from the same transaction and admits that he was unaware of the state charges until after the detainer was filed against him.[4]

The most serious interest—limiting the possibility that the defense will be impaired—is the only one deserving of further scrutiny in this case. Petitioner alleges that "certain" Wichita Police Department transmissions were not available for state attorneys to listen to and that other Kansas Highway Patrol recordings pertaining to the robbery were erased. He asserts that the unavailability of these tapes substantially affected the defense's ability to accurately appraise the sufficiency of the descriptions of suspects transmitted to arresting authorities to give rise to a probable cause determination. These conclusional allegations are not substantiated and are called into question by facts and circumstances in the record. Petitioner does not describe information in these tapes which would have been exculpatory. The mere allegation that evidence could have been presented does not establish that it would have aided the defense. *See United States v. McManaman,* 606 F.2d 919 (10th Cir. 1979); *United States v. Jenkins, supra.* Moreover, the chief dispatcher of the Kansas Highway Patrol testified that all their transmissions had been transcribed and entered in the federal court proceedings. Petitioner's objection to the admission of the federal transcript as a whole is a clear indication that his defense did not depend upon an accurate account of the tapes being made available. No claim is made that the transcriptions were unavailable or inaccurate.

Furthermore, the record reveals that the law enforcement officials receiving the pertinent transmissions of descriptions and information testified in the state proceedings as to the content of those transmissions and were subject to cross-examination by petitioner. Despite his allegations, petitioner makes absolutely no showing that the tapes would have significantly varied from the testimony. As previously noted, petitioner's claims in his petition of having proved that transmissions were received from two sources only and that these sources had made no broadcasts concerning the robbery are not supported by reason or by the record.

Petitioner also claims that he was unable to call three witnesses even though the record discloses that these three persons actually did testify and were examined and

---

4. This finding is not contrary to dicta in *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1967), for the reason that the possible conditions cited therein, such as loss of the chance for concurrent sentences or an increased sentence, are not present in this case. *See also United States v. Ramirez, supra; Moore v. Arizona,* 414 U.S. 25, 27, 94 S.Ct. 188, 190, 38 L.Ed.2d 183 (1973).

recalled by him during the state proceedings. At one point, petitioner seems to be complaining that he was not allowed to rely upon the possibility that these witnesses' memories would fail because the federal transcript contained their fresher testimony. Petitioner points to no portion in the trial transcript indicating any lapse of memory with regard to transmitted descriptions which was significant to the outcome of the trial. The officials testifying did not display a lack of confidence in their own recollection of the material descriptions and information they had received concerning the suspects.

Finally, there is no showing whatsoever that the unavailability of either the Wichita Police Department or the Kansas Highway Patrol recordings was the result of the five-month delay until the time petitioner claims he became aware of state charges. Petitioner, acting as his own counsel, and having competent counsel who had heard the tapes representing him on appeal of his federal conviction, could not have attached great importance to these recordings since he neglected to take action to ensure their preservation.

Petitioner's other allegations of prejudice are also without merit. The impact of removal for trial upon federal prison educational programs may be an interest of concern in the Interstate Agreement on Detainers; however, the act was not properly invoked by petitioner, and interference with prison education is not the type of prejudice contemplated by *Barker v. Wingo. See United States v. Ramirez, supra.* The same is true of Smith's complaint about the denial of a federal appeal bond, which entitled him to nothing more than credit against his federal sentence for the time served. Nor does the violation of a fixed-time limitation or a state speedy trial act, by itself, amount to a violation of the federal constitutional right to a speedy trial. *See Barker v. Wingo, supra,* 407 U.S. at 521–23, 92 S.Ct. at 2187–88.

Upon its balance of the relevant factors and circumstances, this court concludes that the ten-month delay did not deprive petitioner of his right to a speedy trial because it was not unreasonable under the facts of this case and petitioner has not shown that he was significantly prejudiced thereby.

## SUFFICIENCY OF THE EVIDENCE

■ Petitioner claims that the evidence was insufficient to support the guilty verdict. In support of this claim, he asserts that no victim or eyewitness identified him as one of the assailants and concludes that the State failed to prove the crucial element of identity.

The court's review of the record in the light most favorable to the prosecution convinces it that a rational fact-finder could readily have found petitioner guilty of the charges beyond a reasonable doubt under Kansas law. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Reese v. Wainwright,* 600 F.2d 1085 (5th Cir.1979), *cert. denied* 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410; *Soap v. Carter,* 632 F.2d 872 (10th Cir.1980), *cert. denied* 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981); *Brinlee v. Crisp,* 608 F.2d 839 (10th Cir.1979), *cert. denied* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980); *Cudjo v. Hess,* No. 80–1210 (10th Cir., *unpublished,* 1/20/81). The perpetrators of the armed robbery in this case wore stocking caps or some face and head covering. Therefore, of necessity, identification of petitioner was by circumstantial evidence. *See Wright v. Griffin,* No. 81–1995 (10th Cir., *unpublished,* 12/16/82). It is well settled that guilt may be established by circumstantial evidence. *Wright v. Griffin, supra; Kennedy v. Fogg,* 468 F.Supp. 671 (S.D.N.Y.1979).

Direct testimony at the trial in this case indicated that the crimes charged had been committed by two black males wearing certain articles of clothing. One of the perpetrators was described as wearing a long, black coat, a scarf or something around his neck, and denim-colored pants. Overwhelming circumstantial evidence indicated that petitioner and his co-defendant were the two black males who committed the crimes. These two men were observed by a highway patrolman fixing a flat tire on a

Cadillac along the turnpike south of Wichita less than a half hour after the first report of a robbery. The operator of the vehicle, who identified himself as petitioner, was wearing a cloth tied around his neck, a long, black coat and denim-colored pants. His passenger and co-defendant was also wearing clothing like that described by the victims, most notably a large black hat. It was soon discovered that the men had attempted to mislead Trooper McGlasson by telling him that they had come from Kansas City rather than Wichita. Shortly thereafter, petitioner and his co-defendant were arrested on the turnpike in the Cadillac, and a subsequent search of the automobile turned up personal property, including eyeglasses and a gun belonging to the bank security guard, book-binding wire of the sort used to tie up the victims at the bank, firearms, and hundreds of deposit envelopes and checks made out for deposit, as well as cash, which had been taken during the robbery incident at the Fourth National Bank. Most items were found in the trunk of the car, but a torn corner of a bank deposit envelope recovered from the interior of the car matched a torn envelope left at the bank. Checks made out to a church for deposit at the victimized bank were also found on petitioner's person after his arrest. Furthermore, an employee of Rainbow Color Press identified the wire which had been used to restrain the victims and that found in the trunk of petitioner's car as twenty-gauge stainless steel stitcher wire. This witness testified that this kind of wire was used in the book-binding process at Rainbow Color Press where petitioner was employed as a book binder, and that such wire was readily available at the plant, but because of its qualities unique to book binding could not be purchased except from printing distributors.

For the defense, petitioner offered no testimony or evidence other than the following stipulation:

"It is stipulated and agreed by and between counsel for all parties that the following be a part of the evidence of the defendant's case:

"One, that the dispatcher's log of the dispatcher's office of the Ark City Police Department has no record of incoming or outgoing transmissions concerning this robbery on the morning of January 6, 1975;

"Two, it is the policy of that dispatcher's office to record all outgoing transmissions;

"Three, dispatcher's log of the dispatcher for Kay County Sheriff's Office has no record of transmissions prior to 0800 on January 6, 1975, . . . concerning this robbery . . . ." VIII Record, pp. 575–76.

After entry of this stipulation, the prosecutor asked to present evidence, possibly by stipulation, as to the fact that there were other transmissions being broadcast at this time by other agencies. To prevent further delay of the trial, the court denied the request. Thus, the only defense presented by petitioner was his attempt to discredit the testimony of Officer Sinclair and Trooper McGlasson as to the information they possessed concerning the suspects prior to the arrest and search.

A review of the trial transcript satisfies this court that the State's evidence was sufficient to support petitioner's conviction beyond a reasonable doubt.

### DENIAL OF CONFRONTATION

Petitioner claims that he was denied his confrontation rights in that the transcript of the suppression hearing held in federal court prior to his bank robbery trial was admitted into evidence in the state suppression hearing. He exclaims that the State's witnesses, who had testified in the federal hearing but were unavailable to testify at the state proceedings, could not remember the events as well at his state trial so that he was somehow denied his right to confront and cross-examine these adverse witnesses.

At the outset, the court notes that petitioner also alleges that the federal transcript was utilized as part of the State's "case-in-chief." This allegation is without any support whatsoever in the transcript of

trial. The transcript of the federal suppression hearing was not offered to the jury as substantive evidence at the state trial. On the few occasions when testimony from the federal trial was recalled by both parties to impeach or refresh a witness, that witness was testifying and fully subject to confrontation and cross-examination at the state trial.

The Sixth Amendment right of a criminal accused to be confronted with witnesses against him is a protection which the Fourteenth Amendment makes obligatory on the States. *Pointer v. State of Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965). The primary object of the Confrontation Clause

> "... was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoners in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony, whether he is worthy of belief...." *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

There was no federal confrontation violation at the state suppression hearing in this case for the reason that none of the former testimony of witnesses was admitted in lieu of contemporary testimony and cross-examination. *See California v. Green,* 399 U.S. 149, 161–62, 90 S.Ct. 1930, 1936–37, 26 L.Ed.2d 409 (1970); *cf., Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Instead, all the witnesses whose testimony appeared in the transcript of the federal suppression hearing also testified at the state suppression hearing, and Judge Klein clearly informed petitioner that he could not only cross-examine these witnesses, but he could call any of them as his own witness and thereby remove any limitations on the scope of his

inquiry. V Record, pp. 67–80. Petitioner called these witnesses for cross-examination at the state suppression hearing. He also cross-examined Sixkiller, McGlasson and Sinclair at trial. Petitioner does not show that he requested the presence of any witnesses or that the State failed to make a reasonable effort to secure the presence of any witness. He was repeatedly told by the state judge that he could have any witnesses he requested and he did not object to the absence of any witness at trial. He simply chose not to call any witnesses.

The court concludes that the purposes of the Confrontation Clause were satisfied at the state suppression hearing in this case, even if not before, for the reasons that the witnesses were under oath, were subject to cross-examination, and their demeanor was observed by the trier of fact. In addition, the witnesses had been subject to cross-examination by competent counsel in the former proceeding and were all either actually produced or were available to testify at the state trial. The record shows that petitioner was given ample opportunity to challenge the credibility of the witnesses against him in face-to-face encounters before the triers of fact. Under such circumstances, no violation of the federal Confrontation Clause is stated. *See California v. Green, supra; Haywood v. Wolff,* 658 F.2d 455 (7th Cir.1981), *cert. denied* 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625.

## DENIAL OF SEVERANCE

■ Petitioner claims that the denial of his motion to sever his trial from that of his co-defendant rendered his trial fundamentally unfair. In support of this claim, petitioner alleges that he was never identified as being at the scene of the crime, that his defense of not having been present was "completely antagonistic" to the defense of his co-defendant, who was "weakly identified" as being at the scene, and that he was prejudiced by the possibility of guilt by association with his co-defendant.

The granting of separate trials is a matter for the discretion of the trial court. *See United States v. Bridwell,* 583 F.2d 1135

(10th Cir.1978). The record in the instant case clearly supports respondent's assessment of this claim:

"In the present case, both defendants were charged with basically the same crimes arising out of the same transactions. Contrary to petitioner's assertion, the defenses of the co-defendants were not antagonistic. In fact, both defendants relied heavily in (sic) the defense that they were not convincingly identified as the bank robbers at trial....

"... Plaintiff's assertion that the evidence tended to implicate only co-defendant Miller is pure speculation. Indeed, the jurors could conclude, and most probably did conclude, that the evidence convincingly identified *both* defendants as the bank robbers involved in the crime. Petitioner's allegation of 'guilt by association' is speculative and without merit." Respondents' Answer and Return, pp. 22–23.

As with some of his other claims, petitioner purports to allege "facts" in support of this claim which are not consonant with the record. Contrary to his implications, petitioner offered no evidence or articulated theory that he was somewhere other than present at the scene of the crime. His defense was nothing more than challenges to the credibility of the adverse testimony. These challenges to the State's evidence were usually raised or joined by both defendants and were not antagonistic. There was substantial evidence to implicate both, and the evidence as a whole was not significantly stronger against his co-defendant than it was against petitioner. Petitioner was driving and apparently claimed ownership of the vehicle in which the fruit of the crimes was discovered and had incriminating evidence on his person.

The court concludes that petitioner has utterly failed to establish that he was prejudiced by denial of his motion to sever. *See United States v. Bridwell, supra; Tifford v. Wainwright,* 588 F.2d 954 (5th Cir.1979).

## ERRONEOUS JURY INSTRUCTION

Petitioner claims that jury instruction No. 2 on aggravated kidnapping was erroneous because it did not require the jury to find that bodily harm was inflicted after the act of kidnapping, and because it did not require a finding of a separate act of violence or bodily harm from that which was used to establish aggravated robbery. The court instructed the jury in instruction No. 2 that in order to establish the charge of aggravated kidnapping, each of the following elements had to be proved:

"(1) that the defendants took or confined Isaac R. Linder by force or threat;

"(2) that it was done with the intent to hold such person to facilitate flight and facilitate the crime of aggravated robbery;

"(3) that bodily harm was inflicted on Isaac R. Linder; and

"(4) that this act occurred on or about the 6th day of January, 1975, in Sedgwick County, Kansas." I Record, p. 108.

Petitioner's requested instruction No. 8 read:

"In order to find the defendants or either of them guilty of aggravated kidnapping, you must find beyond a reasonable doubt that bodily harm was inflicted by the alleged kidnapper *after* the act of kidnapping." (Emphasis added.)

The requested instruction is based upon petitioner's theory that there must have been a separate and subsequent act of violence connected with the kidnapping from that which gave rise to the aggravated robbery charge.

Section 21–3421 of the Kansas Statutes Annotated defines aggravated kidnapping:

"Aggravated kidnapping is kidnapping, as defined in section 21–3420, when bodily harm is inflicted ..."

There is no requirement in this statute that the bodily harm be inflicted *after* the victim is moved or kidnapped. In fact, the Kansas Supreme Court held that the Kansas statute on aggravated kidnapping did not require the infliction of bodily harm to occur after the kidnapping. Federal courts are bound by a state court's interpretation of a state statute unless it is

inconsistent with fundamental principles of justice. *Garner v. Louisiana,* 368 U.S. 157, 166, 82 S.Ct. 248, 253, 7 L.Ed.2d 207 (1961); *Pierce v. State of Oklahoma,* 436 F.Supp. 1026 (W.D.Okl.1977); *see also Parham v. Manson,* 500 F.Supp. 551 (D.Conn.1981); *Havens v. Solem,* 455 F.Supp. 1132 (D.S.D. 1978). The Kansas court's interpretation of the aggravated kidnapping statute and its upholding of the instruction based thereon is not shown to be inconsistent with such principles. The court concludes that petitioner's claim that the jury instruction was erroneous is without legal merit.

Moreover, this claim lacks factual merit since there were sufficient aggravating circumstances which occurred in connection with both charges. On appeal, petitioner argued that the aggravated robbery occurred when Linder was confronted by two men with drawn guns who took his gun and keys. Mr. Linder testified that he was struck on his head outside the bank and that his wrist was cut when bound by wire while still inside the bank. Linder was hit on the side of his head when he tried to call for help.

■ Most importantly, the court finds that petitioner's proposed instruction No. 8 was not a correct statement of the Kansas law on aggravated kidnapping. A criminal defendant is entitled to the giving of a requested instruction only if it is a correct statement of the law. *Tyler v. Wyrick,* 635 F.2d 752 (8th Cir.1980), *cert. denied* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981). Instruction No. 2 was a correct statement of the law and was supported by the evidence adduced at trial.

■ It is well settled that the failure of a trial judge to give a particular instruction does not raise a federal constitutional question unless the error rendered the trial so fundamentally unfair as to have denied the defendant due process of law. *Brinlee v. Crisp, supra; Tyler v. Wyrick, supra; Arce v. Henderson,* 477 F.Supp. 71 (S.D.N.Y. 1979), *aff'd.* 636 F.2d 1200 (2nd Cir.1980), *cert. denied* 451 U.S. 914, 101 S.Ct. 1989, 68 L.Ed.2d 305 (1981); *Collins v. Crist,* 473 F.Supp. 1354 (D.Mont.1979); *see also, Cudjo*

*v. Hess, supra.* This court has reviewed the instructions and transcript of trial as a whole and finds that the instructions covered the basic elements which were constitutionally required, and that petitioner has failed to demonstrate that he was denied due process of law by reason of the trial court's refusal to give the requested instruction. *Brinlee v. Crisp, supra.*

■ If petitioner's intent is to argue that the charges of aggravated robbery and aggravated kidnapping were duplicitous, this claim is also without merit. Each of these offenses requires proof of at least one element which the other does not. Furthermore, it is clear that the Kansas courts and legislature intended that punishment may be imposed for two separate statutory offenses even if they contain some identical factual elements as long as the statutory elements are distinct. *See. Goodseal v. Atkins, supra.*

## ADVERSE PRETRIAL PUBLICITY

Petitioner claims that the state trial judge erred in denying defense counsel's request to poll the jury after return of its verdict concerning a newspaper article appearing in the Wichita Eagle on November 18, 1975, which reported that petitioner and his co-defendant had been convicted in federal court in Wichita. Petitioner claims that the defense attorneys first became aware of the publicity near the conclusion of the trial, so it was impossible to raise the issue prior to trial, and that the refusal to poll prevented them "from discovering what effect the highly prejudicial publicity had on the jury." The judge, in denying the request, stated that in his view the publicity was minimal and the jury had been admonished to disregard any such publicity at every stage of the proceedings each time they left the courtroom.

■ State court convictions may be overturned by federal courts on the basis of juror exposure to adverse pretrial publicity when the trial atmosphere has been "utterly corrupted by press coverage" or the defendant has shown actual prejudice. *Mur-*

*phy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Mayola v. State of Alabama,* 623 F.2d 992 (5th Cir.1980), *cert. denied* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). Juror exposure to news accounts about a state defendant's prior convictions do not alone presumptively deprive the defendant of due process. *Murphy v. Florida, supra.*

▆ The record in this case discloses that in the course of jury selection, which took place on November 17th and 18th, members of the panel were questioned about any prior knowledge or preconceptions they might have acquired of the case through news accounts or other means. *See, e.g.,* VIII Record, pp. 29, 93, 107, 204, 223, 241. Three persons who vaguely recalled having heard news reports of the crime were excused. VIII Record, pp. 114, 241. On November 17, the court had admonished the jury array:

"You will make no inquiry or effort to obtain information about this case outside of the trial of the case instead of in the trial. All information you use in your verdict should be based upon the evidence submitted in the trial." VIII Record, p. 194.

Again, on November 18th, before recessing, the court admonished the jury:

"You will make no personal investigation or inquiries to acquire knowledge outside the trial of this case regarding the issues in this case. You will disregard any news publications concerning the trial in the event there should be any." VIII Record, p. 340.

The trial judge's description of the news coverage in this case as "minimal" is not refuted by petitioner. Nor does he make any showing whatsoever that jurors who decided his case were actually exposed to news accounts of the crime or that they prejudged his guilt as a result of such exposure. The court concludes that petitioner has failed to present facts tending to show inherent prejudice in the trial setting or actual prejudice on the part of any juror. Petitioner has presented no affidavits or other proof of juror bias to any court which

has heard this claim. Even though the trial judge denied his motion to poll the jury, petitioner and defense counsel were free to question the jurors after the trial concerning the possibility of prejudice since the judge informed the jury after the verdict was entered that they were free to discuss the case and express their opinions about their jury service with anyone. Petitioner's claim, standing alone as it is, that he was denied a fair trial solely because of the judge's denial of his motion to poll the jury is without merit.

### IMPROPER PROSECUTORIAL ARGUMENT

During closing arguments, the prosecution stated to the jury:

"... You have an overwhelming amount of evidence. One of the strongest cases I've ever had the luck to be a part of ..." VII Record, p. 639.

Defense counsel immediately objected to these remarks and asked that they be stricken. The court ruled that "counsel's personal opinion will be stricken from the argument." Petitioner thereafter moved for a mistrial on the basis of this remark, which motion was denied. After a thorough review of the entire record, this court finds that the allegedly improper argument did not deprive petitioner of the fundamentally fair trial guaranteed to him under the Due Process Clause of the Fourteenth Amendment.

▆ It is well established that the federal writ of habeas corpus is not available to redress improper prosecutorial statements in state court unless the error was so fundamentally unfair as to deny defendant a fair trial. *Cupp v. Naughton,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Runnells v. Hess,* 653 F.2d 1359 (10th Cir. 1981); *Thomas v. Cardwell,* 626 F.2d 1375 (9th Cir.1980), *cert. denied* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). In the context of the entire trial, the error alleged

in this case did not prejudice petitioner's due process rights.

First, and most importantly, the State developed, apart from the asserted statement, a most compelling case against petitioner. That evidence was discussed *infra* under "sufficiency of the evidence."

In contrast to this substantial evidence of guilt, little or no actual prejudice arising from the claimed misconduct has been shown. Indeed, petitioner has submitted nothing to suggest that this comment materially increased the impact of the State's evidence already produced. On the other hand, the record shows that the jury was instructed more than once that arguments of counsel were not evidence and that they should be guided by their own recollection of the facts rather than counsel's.

Similarly, the totality of the circumstances indicates that the prosecutor's remark in summation was not prejudicial. In fact, his comment may have been little more than a rejoinder to defense counsel's prior statement that petitioner was not identified as being at the bank "except by poor circumstantial evidence in my opinion." VIII Record, p. 624. Courts have upheld the "right of the prosecution to rebut an argument raised by the defense, even to the extent of permitting the prosecutor to inject his view of the facts to counter the defense counsel's view of the facts." *Orr v. Schaeffer*, 460 F.Supp. 964 (S.D.N.Y.1978). Here, the trial judge characterized the prosecutor's remark as personal opinion and ordered it stricken from the record.

Finally, even if the court were to accept petitioner's claim that the prosecutor's conduct was improper, our review of the entire closing argument and the trial as a whole convinces us that any error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976), *rehearing denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241; *Anaya v. Romero*, 627 F.2d 226 (10th Cir. 1980), *cert. denied* 450 U.S. 926, 101 S.Ct. 1380, 67 L.Ed.2d 356 (1981). While a prosecutor's statement to the jury of his personal opinion of the strength of the evidence in a particular trial does not comport with standards of propriety, it is quite another thing to say that this statement constituted prejudicial error. It is inconceivable that the jury in this case was persuaded to return a verdict of guilty based on the isolated comment instead of on the overwhelming evidence of petitioner's guilt properly admitted at trial.

This court has reviewed each of the claims raised in this petition and finds that petitioner is not entitled to federal habeas corpus relief.

IT IS BY THE COURT THEREFORE ORDERED that this action is hereby dismissed and all relief denied.